IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDHYA VERMA, | : | |
| | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 11-611 |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**OPINION**

**Slomsky, J.**                                                                               **May 18, 2012**

## I.   INTRODUCTION

This case involves an allegation of employment discrimination.  On January 28, 2011,

Plaintiff Sandhya Verma ("Plaintiff") filed a Complaint against Defendant University of

Pennsylvania ("Defendant").  (Doc. No. 1.)   In her Complaint, Plaintiff alleges she was

terminated on account of her national origin, race,[1] and age[2] in violation of federal and state law,

---

[1]  The parties do not dispute that Plaintiff's Indian descent qualifies as both a "race" and "national origin" for purposes of her discrimination claims.  The Third Circuit has treated claims of discrimination on the basis of race and national origin by plaintiffs of Indian descent as proper under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  See Bhatt v. Brownsville Gen. Hosp., 236 F. App'x 764, 766 (3d Cir. 2007); Waris v. Heartland Home Healthcare Services, Inc., 365 F. App'x 402, 403 (2010).  Furthermore, "the line between discrimination based on 'ancestry or ethnic characteristics' and discrimination based on 'place or nation of . . . origin' is not a bright one[,]" and therefore the Court will treat Plaintiff as belonging to a protected class which includes both her race and national origin.  St. Francis College v. Al-Khazraji, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (citations omitted).

[2]  In her Reply in Opposition to the Motion for Summary Judgment, which, in part, is discussed herein, Plaintiff admits that there is insufficient evidence to support her age

and was subjected to retaliation for making her claim of discrimination.  (Doc. No. 1 at ¶¶ 31-

46.)  Plaintiff seeks all legal and equitable remedies available, including reinstatement, back pay,

front pay, compensation for past and future mental anguish and pain and suffering, punitive

damages and attorney's fees.  (Doc. No. 1 at 8.)  On February 13, 2012, Defendant filed a Motion

for Summary Judgment.  (Doc. No. 17.)  Defendant's Motion and Plaintiff's Response have been

fully briefed by the parties and is now ripe for disposition.[3]  For reasons that follow, Defendant's

Motion for Summary Judgment will be granted.

## II.    FACTUAL BACKGROUND

Plaintiff Sandhya Verma ("Plaintiff") is a forty-seven-year-old female of Indian origin, a

citizen of Pennsylvania, and was an employee of Defendant from approximately March 8, 2004

to March 18, 2008.  (Doc. No. 1 ¶ 4; Doc. No. 3 ¶ 4.)  Defendant University of Pennsylvania is a

private university located in Philadelphia, Pennsylvania.  (Doc. No. 1 ¶ 5; Doc. No. 3 ¶ 5.)  In

March 2004, Plaintiff was hired by Defendant as an International Student Services Specialist

within Defendant's International Student and Scholar Services Department ("ISSS").  (Doc. No.

17-1 ¶ 22; Doc. No. 20-3 ¶ 22.)  Plaintiff's duties included processing immigration forms for

---

discrimination claim.  Specifically, Plaintiff "concedes that there is scant evidence to support a
claim of age discrimination[.]"  (Doc. No. 20-2 at 5 n.1.)  Effectively, Plaintiff concedes that
summary judgment should be granted on this claim.  Therefore, the Court will not discuss
Plaintiff's age-related claim in this Opinion and will grant summary judgment on this claim.

[3]  In deciding Defendant's Motion for Summary Judgment, the Court has considered the
Motion (Doc. No. 17), Plaintiff's Complaint (Doc. No. 1), Defendant's Answer and Affirmative
Defenses (Doc. No. 3), Defendant's Separate Statement of Undisputed Material Facts (Doc. No.
17-1), Plaintiff's Response in Opposition (Doc. No. 20), Plaintiff's Answer to Defendant's
Separate Statement of Undisputed Material Facts (Doc. No. 20-3), Declaration of Plaintiff in
Opposition to Defendant's Motion for Summary Judgment (Doc. No. 23), and Defendant's Reply
in Further Support of Motion for Summary Judgment (Doc. No. 24).

students, assisting in an orientation program for students enrolled in Defendant's English

Language Program ("ELP"), answering telephone calls, covering ISSS's front desk, answering

emails, and other general office duties.  (Doc. No. 17-1 ¶ 30; Doc. No. 20-3 ¶ 30.)

Central to Plaintiff's claims is the treatment she received from three supervisors between

2005 and her termination in 2008.  They are Sheila Gardner, Rodolfo Altamirano, and Kate

Zheng.  (See generally Doc. No. 17-1; Doc. No. 20-3.)  As discussed below, Plaintiff refused to

perform various job duties assigned by all three supervisors, and, as a result, she received

multiple negative performance reviews prior to being placed on probation and eventually

terminated.  (See, e.g., Doc. No. 17-1 ¶¶ 35, 53, 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 35, 53,

65-69, 75, 79, 95, 98.)[4]  The remainder of this factual background will outline Plaintiff's

experiences with each of these supervisors.

### A.    Sheila Gardner: Plaintiff's Supervisor from January 2006 to August 2006

In January 2006, Sheila Gardner ("Gardner") became Interim Director of ISSS.  (Doc.

No. 17-1 ¶ 33; Doc. No. 20-3 ¶ 33.)  Gardner assigned Plaintiff additional job duties such as

adding advisors' schedules to the ISSS online appointment scheduler, but Plaintiff refused to

perform these duties.  (Doc. No. 17-1 ¶ 35; Doc. No. 20-3 ¶ 35.)  Plaintiff contends that she was

---

[4] Plaintiff does not dispute these facts.  In its Separate Statement of Undisputed Facts, Defendant outlines various policies and procedures relating to employee performance, discipline and prohibition against harassment and discrimination.  (Doc. No. 17-1 ¶¶ 1-19.)  Defendant's Discipline Policy stipulates that "cases of serious misconduct could result in termination of employment[,]" and defines "serious misconduct" as including "insubordination."  (Id. ¶¶ 4-5.)  Defendant's Affirmative Action Handbook, which provides a "detailed procedure for resolving complaints of discrimination and harassment[,]" gives employees the "right to appeal a decision on the resolution of a formal [discrimination or harassment] complaint within fifteen days of the notice of the decision."  (Id. ¶¶ 14, 17.)  Plaintiff claims that she was "not aware" of this right to appeal.  (Declaration of Plaintiff, Doc. No. 23 ¶ 3.)

"forced to take on" these additional duties because one of her co-workers, Suat Albulut

("Albulut"),[5] had refused to do them.  (Doc. No. 20-3 ¶ 35.)  In Plaintiff's deposition, she

commented that "when I said no [to Gardner], that's what created the whole hoopla and

[Gardner] was like, [']How the hell[?]  You have to do it.  Either you listen to me or you will be

fired.[']"  (Doc. No. 17, Ex. 1, Plaintiff's Dep. 87-89; 92-93.)

On June 23, 2006, Gardner issued a performance review for Plaintiff, in which Gardner

noted that Plaintiff "needed to improve her 'adaptability' and team work, and that she would be

expected to promptly assume new job duties assigned to her."  (Doc. No. 17-1 ¶¶ 39-40 (citing

Doc. No. 17, Ex. 8); Doc. No. 20-3 ¶¶ 39-40.)  Plaintiff claims that, prior to this performance

review, she had filed a discrimination complaint against Gardner with Defendant's Ombudsman,

Dr. Gulban O'Connor ("Ombudsman O'Connor").  (Doc. No. 20-3 ¶ 38.)  Specifically, Plaintiff

alleges that, although  Gardner would grant Plaintiff's co-workers' (such as Albulut's) requests

to work from home, when Plaintiff had a plumbing emergency and requested to work from home,

"Gardner refused her request and required [Plaintiff] to complete a time off request sheet."  (Id.)

Plaintiff claims that she provided documentation to support her discrimination complaint to

Ombudsman O'Connor as well as to the Executive Director of Defendant's Office of

International Programs ("OIP"), Dr. JoAnn McCarthy.  (Id.)  Furthermore, Plaintiff alleges that,

at the time Gardner issued her performance review, Gardner was "aware of [Plaintiff's] hostile

[work] environment[,]" and had observed a co-worker, Sharmayne Sin ("Sin"),[6] "scream and

---

[5]  Plaintiff alleges that Albulut is a non-Indian (Doc. No. 20-2 at 6), but does not describe
Albulut's race, age or national origin.

[6]  Plaintiff alleges that Sin is a non-Indian (Doc. No. 20-2 at 6), but does not describe
Sin's race, age or national origin.

shout at [Plaintiff] and generally create mayhem in the office[.]"  (Id. ¶ 40.)

### B.      Rodolfo Altamirano: Plaintiff's Supervisor from August 2006 to May 2007

In August 2006, Rodolfo Altamirano ("Altamirano") became Director of ISSS.  (Doc. No. 17-1 ¶ 41; Doc. No. 20-3 ¶ 41.)  Plaintiff testified in her deposition that she initially had a good relationship with Altamirano and that he told Plaintiff she did a "very good job."  (Doc. No. 17-1 ¶ 46; Doc. No. 20-3 ¶ 46.)  However, while Defendant alleges that Altamirano told Plaintiff "he wanted her to stay working at UPenn but that [Plaintiff] needed to do what was asked of her[,]" Plaintiff denies that Altamirano ever made this statement.  (Doc. No. 17-1 ¶ 46; Doc. No. 20-3 ¶ 46.)  Additionally, Defendant claims that Plaintiff "took offense" when Altamirano asked her to "work together and cooperate with [] Sin, one of her co-workers[,]" but Plaintiff denies that this request offended her.  (Doc. No. 17-1 ¶ 47; Doc. No. 20-3 ¶ 47.)  Altamirano had a conference with Plaintiff and Sin, in which Altamirano issued a written warning to both employees regarding their cooperation, or lack thereof.  (Doc. No. 17-1 ¶ 49 (citing Doc. No. 17 Ex. 9); Doc. No. 20-3 ¶ 49.)

After this initial conference, Altamirano held regular meetings with Plaintiff and Sin to discuss the progress of their working relationship.  (Doc. No. 17-1 ¶ 50; Doc. No. 20-3 ¶ 50.)  Plaintiff alleges that Altamirano's handling of this situation was discriminatory because he "would meet with Sin . . . but he would not meet with [Plaintiff] and allow her to discuss the details of her complaints about Sin.  [In addition,] Altamirano typically accepted Sin's complaints as true, and, in an email, would convey them to [Plaintiff]."  (Doc. No. 20-3 ¶ 51.)[7]

_____

[7]  Plaintiff's Separate Statement of Facts contains somewhat self-contradictory statements regarding the meetings with Altamirano.  Although Plaintiff admits that Altamirano held regular meetings with herself and Sin (Doc. No. 17-1 ¶ 50; Doc. No. 20-3 ¶ 50), Plaintiff also alleges

Plaintiff also claims Altamirano made an offensive discriminatory comment to her during a meeting with Plaintiff and Sin, in which Altamirano commented that Plaintiff's "cultural background" was an influence in her perception of workplace events and in her conduct.  (Doc. No. 20-3 ¶ 190.)  In its Brief in Support of the Motion for Summary Judgment, Defendant acknowledges that Altamirano made this comment but contends that it was "not even disparaging[,]" and that Plaintiff herself "admitted that the substance of Altamirano's observation was true, because she and Sin were in fact from different cultural backgrounds[.]"  (Doc. No. 17-2 at 8.)

Plaintiff also alleges Altamirano discriminated against her by subjecting her to differential treatment regarding her lunch schedule.  (Doc. No. 17-1 ¶ 52; Doc. No. 20-3 ¶ 52.)  Specifically, Plaintiff alleges that, although she requested an earlier lunch hour, Altamirano assigned her to a later one in order to accommodate Josie Yaller and Jackie Mower, two of Plaintiff's white, female colleagues who wanted to have lunch together.  (Id.)

Plaintiff continued to have workplace conflicts with co-workers Albulut and Sin.  (Doc. No. 17-1 ¶ 53; Doc. No. 20-3 ¶ 53.)  In April 2007, Altamirano issued a performance review of Plaintiff in which he rated her performance as "unacceptable" and requiring "significant improvement."  (Doc. No. 17-1 ¶ 55 (citing Doc. No. 17, Ex. 11); Doc. No. 20-3 ¶ 55.)  Plaintiff objected in writing to Altamirano's negative review of her performance.  (Doc. No. 20-3 ¶ 55.)

### C.    Kate Zheng: Plaintiff's Supervisor from May 2007 to December 2007

In May 2007, Defendant hired Kate Zheng ("Zheng") as the Associate Director of ISSS,

---

that Altamirano "would not meet with [Plaintiff] and allow her" to explain her complaints about Sin.  (Doc. No. 20-3 ¶ 51.)

and Zheng became Plaintiff's immediate supervisor.  (Doc. No. 1 ¶ 7; Doc. No. 3 ¶ 7.)  Plaintiff

alleges that, thereafter, Zheng "began a campaign of severe and pervasive harassment against

[Plaintiff] based solely on [Plaintiff's] . . . national origin."  (Doc. No. 1 ¶ 8.)  Plaintiff cites

several specific examples of what she asserts are discriminatory treatment by Zheng.  These

allegations include:  (1) disproportionate work assignments compared to her co-workers, (Doc.

No. 17-1 ¶ 63; Doc. No. 20-3 ¶ 63); (2) refusing to allow Plaintiff to attend English Language

Program ("ELP") presentations while permitting her white co-worker to do so (Doc. No. 17-1 ¶

73; Doc. No. 20-3 ¶ 73); and (3) forcing Plaintiff to perform job tasks related to the processing of

immigration paperwork that a white, female co-worker refused to do (Doc. No. 17-1 ¶¶ 80-99;

Doc. No. 20-3 ¶¶ 80-99).  Plaintiff made written and verbal objections to both Altamirano and

Zheng.  (Doc. No. 17-1 ¶¶ 63, 73, 77; Doc. No. 20-3 ¶¶ 63, 73, 77.)  She also refused to complete

an assigned self-evaluation and refused to perform certain assigned job tasks because they were

"not [her] job."  (Doc. No. 17-1 ¶¶ 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 65-69, 75, 79, 95, 98.)

        In October 2007, Plaintiff copied Defendant's HR Director, Susan Curran ("Curran"), on

an email to Altamirano in which Plaintiff claimed Zheng was discriminating against her and

subjecting her to unfair treatment.  (Doc. No. 17-1 ¶ 155 (citing Doc. No. 17, Ex. 30); Doc. No.

20-3 ¶ 155.)  Curran investigated Plaintiff's discrimination claim.  She met with Plaintiff and

Zheng in October 2007, and asked Plaintiff and Zheng to provide documentation and other

information.  (Doc. No. 17-1 ¶¶ 157-65; Doc. No. 20-3 ¶¶ 157-65.)  Defendant contends that

Curran then had a meeting with Plaintiff on October 18, 2007 and stated that her conclusion was

that Plaintiff had refused to perform assigned job tasks, in response to which Plaintiff became

visibly upset.  (Doc. No. 17-1 ¶¶ 166-68.)  Plaintiff denies that Curran ever met with her to

discuss the results of the investigation.  (Doc. No. 20-3 ¶¶ 166-68.)

Curran referred Plaintiff to Pat Miller ("Miller") in Defendant's Office of Affirmative Action.  (Doc. No. 17-1 ¶¶ 171-73; Doc. No. 20-3 ¶¶ 171-73.)   Plaintiff met with Miller in October 2007 and completed a complaint form.  (Id.)  Miller investigated Plaintiff's complaint, interviewing Plaintiff, Zheng, Altamirano, and several of Plaintiff's co-workers.  (Doc. No. 17-1 ¶ 180; Doc. No. 20-3 ¶ 180.)  Following the investigation, Miller concluded that there was no information to support Plaintiff's allegations of discriminatory treatment, and that, on the contrary, Plaintiff's supervisors had taken appropriate action in response to Plaintiff's "genuine performance and behavior issues."  (Doc. No. 17-1 ¶ 187; Doc. No. 20-3 ¶ 187.)  Miller informed Plaintiff of this conclusion in a letter dated February 14, 2008.  (Doc. No. 17-1 ¶ 188 (citing Doc. No. 17, Ex. 33); Doc. No. 20-3 ¶ 188.)

Before Zheng left her job as ISSS Associate Director in December 2007, she wrote a negative performance review in which she indicated that Plaintiff had been inflexible and had refused to perform certain job tasks.  (Doc. No. 17-1 ¶¶ 100-03 (citing Doc. No. 17, Ex. 20); Doc. No. 20-3 ¶¶ 100-03.)

### D.   Rodolfo Altamirano: Plaintiff's Supervisor from December 2007 to March 2008

Following Zheng's departure in December 2007, Altamirano again became Plaintiff's direct supervisor.  (Doc. No. 17-1 ¶ 104; Doc. No. 20-3 ¶ 104.)  Defendant contends that, despite Zheng's review and a written warning from Altamirano, Plaintiff persisted in refusing to perform assigned job tasks.  (Doc. No. 17-1 ¶¶ 105-08; Doc. No. 20-3 ¶¶ 105-07.)  Plaintiff denies that

she continued to refuse job tasks. (Doc. No. 20-3 ¶ 108.)[8]

It was understood by both parties that if Plaintiff did not comply with the terms of Altamirano's written warning, she would be terminated. (Doc. No. 17-1 ¶ 106; Doc. No. 20-3 ¶ 106.) In January 2008, after an absence from work due to the death of Plaintiff's father, she complained to Altamirano that none of her co-workers had done any of her work in her absence. (Doc. No. 17-1 ¶¶ 114-15; Doc. No. 20-3 ¶¶ 114-15.) Plaintiff claims that, when other co-workers were absent, she was assigned to do their work. (Doc. No. 20-3 ¶ 115.) Altamirano told Plaintiff that her work had not been covered because the computer system had been offline, but Plaintiff, after checking and allegedly discovering the computers "had been working fine while she was out of the office," challenged Altamirano and was "admonished for 'arguing[.]'" (Id.)

On February 15, 2008, Altamirano issued a written letter to Plaintiff putting her on probation. (Doc. No. 17-1 ¶ 116 (citing Doc. No. 17, Ex. 24); Doc. No. 20-3 ¶ 116.) Plaintiff told Altamirano that the probation letter was unfair, and that it was "against all the labor laws." (Doc. No. 17-1 ¶ 119; Doc. No. 20-3 ¶ 119.) Defendant claims that Plaintiff never told Altamirano she believed her probation to be discriminatory on account of her Indian origin, but Plaintiff states that she told Altamirano that her probation was "harassing and discriminatory." (Doc. No. 17-1 ¶ 120; Doc. No. 20-3 ¶ 120.) Defendant also claims that Altamirano continued to meet with Plaintiff to discuss her work performance following the probation letter, but Plaintiff denies this claim and alleges Altamirano had no performance-related meetings with her after February 15, 2008. (Doc. No. 17-1 ¶ 121; Doc. No. 20-3 ¶ 121.)

---

[8] Despite this denial, Plaintiff admits that she did not send follow-up emails to students that Altamirano instructed her to send on March 5, 2008. (Doc. No. 17-1 ¶¶ 124-32; Doc. No. 20-3 ¶¶ 124-32.)

On March 5, 2008, Altamirano asked Plaintiff to send follow-up emails to students in response to their questions regarding their immigration processing because her original email responses to the students were confusing and "not acceptable."  (Doc. No. 17-1 ¶¶ 122-23; Doc. No. 20-3 ¶¶ 122-23.)  Plaintiff refused to comply with this instruction.  (Doc. No. 17-1 ¶¶ 124-32; Doc. No. 20-3 ¶¶ 124-32.)  Defendant states that Plaintiff's conduct in regard to these student emails led Altamirano to believe that he had "exhausted all avenues to help [Plaintiff] succeed" and that he therefore decided to terminate her employment.  (Doc. No. 17-1 ¶¶ 133-35.)  Plaintiff denies this claim, and re-states her allegation that Altamirano's decision to terminate her was based on her race and national origin, and in retaliation for her internal complaints and official complaint to the Pennsylvania Human Relations Commission ("PHRC").  (Doc. No. 20-3 ¶¶ 133-35.)

On March 12, 2008, Plaintiff filed an amended charge of discrimination with the PHRC and the Equal Employment Opportunity Commission ("EEOC").  (Doc. No. 1 ¶ 24.)  Plaintiff claims that Altamirano "obtained knowledge" of her intent to file this charge, and that "in retaliation thereof and motivated by discrimination," on March 18, 2008, Altamirano terminated Plaintiff's employment.  (Doc. No. 1 ¶¶ 24-25; Doc. No. 17 Ex. 26.)

Following her termination, Plaintiff wrote an email to her co-workers regarding the reasons she believed Altamirano terminated her, but she did not claim in this email that Altamirano's motivation was based on race, age, or national origin.  (Doc. No. 17-1 ¶¶ 140-41 (citing Doc. No. 17, Ex. 27); Doc. No. 20-3 ¶¶ 140-41.)  Although Plaintiff claims that, prior to her termination, she told Altamirano about her intent to file a complaint with the EEOC, Defendant was not served with that complaint until March 26, 2008.  (Doc. No. 17-1 ¶¶ 142-45

(citing Doc. No. 17, Exs. 28-29); Doc. No. 20-3 ¶¶ 142-45.)

Following Plaintiff's termination, Defendant replaced Plaintiff with Aaron Debruin, a white male.  (Doc. No. 20-3 ¶ 205.)

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law."  Macfarlan v. Ivy Hill SNF, LLC., 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  Doe v. Luzerne County, 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49.

In deciding a motion for summary judgment, the Court must view the evidence, making all reasonable inferences from the evidence in the light most favorable to the non-moving party. Macfarlan, 675 F.3d at 271; Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009).  Whenever a factual issue arises which cannot be resolved without a credibility

determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Anderson, 477 U.S. at 255.  If there is no factual issue and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.     DISCUSSION

Defendant seeks summary judgment in its favor on Plaintiff's discrimination and retaliation claims.  In response, Plaintiff argues that Defendant is not entitled to summary judgment.  For reasons set forth below, the Court will grant Defendant's Motion.

### A.     **Plaintiff's Discrimination Claims**

Plaintiff's Complaint contains four counts alleging:  (1) discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count I); (2) discrimination on the basis of age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* (Count II);[9] (3) discrimination on the basis of race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count III); and (4) discrimination on the basis of age, race and national origin in violation of Sections 5(a)-(d) of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-963 (Count IV).  (Doc. No. 1 at ¶¶ 31-46.)

Under Title VII, an employer may not "discriminate against any [employee] with respect

---

[9]  As noted previously, in her Reply in Opposition, Plaintiff concedes that there is insufficient evidence to support her age discrimination claim, and effectively agrees that summary judgment should be granted on Count II.  (Doc. No. 20-2 at 5 n.1.)  Accordingly, the Court will not discuss the age-related discrimination claims of Plaintiff.

to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a). Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment.  Jones v. School Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999).  Race discrimination claims under § 1981 are also treated "virtually identical[ly]" to Title VII discrimination claims at the summary judgment stage.  Langley v. Merck & Co., Inc., 186 F. App'x 258, 261 n.2 (3d Cir. 2006).

The uncontested facts demonstrate that Plaintiff was terminated as a result of her ongoing deficient work performance and discipline problems, as documented in negative performance reviews issued by three different supervisors.  (See, e.g., Doc. No. 17-1 ¶¶ 35, 53, 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 35, 53, 65-69, 75, 79, 95, 98.)  Plaintiff points, however, to various facts that she claims demonstrate discrimination by these supervisors, but these facts are insufficient as a matter of law to demonstrate that Defendant's asserted non-discriminatory reason for terminating Plaintiff was pretext.  Accordingly, the Court will grant summary judgment in favor of Defendant on the discrimination claims contained in Counts I, III, and IV of the Complaint.

As an initial matter, Plaintiff claims that direct evidence demonstrates that she was terminated because her supervisors harbored discriminatory animus towards her on account of her national origin and race.  (Doc. No. 1 ¶¶ 25-26.)  Specifically, she points to one comment made to her in 2006 by Altamirano as evidence of Defendant's discriminatory intent: that her different "cultural background" influenced her perception of events in the workplace.  (Doc. No. 20-3 ¶ 190.)  Put simply, the evidence regarding this single remark does not rise to the level of

purposeful invidious discriminatory intent.  Since Plaintiff does not present sufficient direct evidence of discriminatory animus harbored by Defendant, her claim is controlled by the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Dellapenna v. Tredyffrin/Easttown School Dist., 449 F. App'x 209, 213 (3d Cir. 2011).

Under McDonnell Douglas, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  411 U.S. at 802.  If the plaintiff can successfully establish a *prima facie* case, the burden shifts to the defendant-employer to put forth a non-discriminatory reason for the adverse action.  Id.  The Third Circuit has held that this is a "relatively light burden," which is satisfied if the employer can "articulat[e] a legitimate reason for the unfavorable employment decision[.]"  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Once the employer has offered this legitimate reason, "the burden of production rebounds to the plaintiff, who must then show by a preponderance of the evidence that the employer's explanation is pretextual[.]"  Id.  In order to satisfy the burden of showing pretext at the summary judgment stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764 (citations omitted).  In Fuentes, the Third Circuit held that in order to demonstrate pretext:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  . . . Rather, [she] must demonstrate such weakness, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for [the purported] non-discriminatory reasons."

Id. at 764-65 (internal citations omitted).

       1.      <u>Plaintiff does establish a *prima facie* case of discrimination.</u>

Here, Plaintiff has satisfied her initial burden of establishing a *prima facie* case.  In order to establish a *prima facie* case of discrimination, Plaintiff must prove (1) she belongs to a protected class; (2) she was qualified for her employment position; (3) despite her qualifications, she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action, such as the employer treating similarly situated persons not belonging to the plaintiff's protected class more favorably.  <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (citations omitted).  It is undisputed that Plaintiff (1) belongs to a protected class by virtue of her Indian heritage; (2) was qualified for her employment position; and (3) was subjected to an adverse employment action, namely, termination.  Plaintiff has also satisfied the fourth prong necessary to establish a *prima facie* case by presenting evidence that certain non-Indian co-workers were treated more favorably.  Specifically, she points to certain instances in which the request of non-Indian co-workers for flexibility in their schedule and/or paid-time-off was granted whereas Plaintiff's similar request was refused (Doc. No. 1 ¶¶ 12, 21), and one instance in which the request of non-Indian co-workers to alter their lunch-times was granted whereas Plaintiff's similar request was refused (Doc. No. 20-3 ¶ 52).

        2.       <u>Defendant has put forth a legitimate, non-discriminatory explanation.</u>

Plaintiff having established her *prima facie* case, the burden shifts to Defendant to put forth a legitimate, non-discriminatory explanation for the adverse employment action.  <u>Fuentes</u>, 32 F.3d at 763.  Defendant has produced evidence of numerous instances in which three different supervisors gave Plaintiff negative performance reviews and warnings for unsatisfactory work. (Doc. No. 17-2 at 11-12.)  This evidence fulfills Defendant's "relatively light" burden of putting forth a non-discriminatory reason for Plaintiff's termination.  <u>Fuentes</u>, 32 F.3d at 763.

        3.       <u>Plaintiff does not meet her burden of demonstrating pretext.</u>

Defendant has put forth a non-discriminatory explanation for termination.  The burden shifts back to Plaintiff to demonstrate that the asserted reasons for her termination are pretextual. <u>Fuentes</u>, 32 F.3d at 763.  In order to create a factual dispute over whether Defendant's asserted reasons were pretextual, Plaintiff must put forth evidence from which a finder of fact could reasonably either (1) disbelieve Defendant's stated non-discriminatory reasons for the termination, or (2) believe that an invidious discriminatory purpose was more likely than not a motivating cause of Defendant's actions.  <u>Id.</u>

Plaintiff fails to meet the evidentiary burden necessary to show pretext.  As opposed to presenting evidence from which a factfinder might disbelieve that Defendant terminated Plaintiff due to poor work performance, Plaintiff admits that she refused to perform assigned job tasks and was argumentative with her supervisors.  (<u>See, e.g.</u>, Doc. No. 17-1 ¶¶ 35, 53, 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 35, 53, 65-69, 75, 79, 95, 98.)  Furthermore, Plaintiff provides no evidence that could support a reasonable inference of an invidious discriminatory purpose behind her

termination.  She relies primarily on her allegations that she was given differential treatment compared to certain non-Indian co-workers.  (Doc. No. 23 ¶¶ 6, 11, 12, 16, 18, 20, 28, 34.) However, even assuming Plaintiff was in fact occasionally treated differently and less favorably than certain non-Indian colleagues, this evidence does not prove that Defendant's decision to terminate Plaintiff was motivated by discriminatory animus as opposed to poor work performance and insubordination.

Additionally, although Plaintiff refused to perform certain assignments because she claimed that they were "not [her] job" (Doc. No. 17-1 ¶¶ 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 65-69, 75, 79, 95, 98), even if this were true, and Plaintiff's supervisors did in fact give her assignments outside the scope of her employment, this "is insufficient to defeat summary judgment [on the issue of pretext] . . . [because it] does not demonstrate any 'inconsistency' between [Defendant's] proffered reason [for terminating Plaintiff] and [Defendant's] perception of [Plaintiff's] behavior." Hood v. Pfizer, Inc., 322 F. App'x 124, 128 (3d Cir. 2009) (internal citations omitted).  Finally, as previously discussed, Altamirano's comment in 2006 regarding Plaintiff's "cultural background" has little probative value because it was a "stray remark[] . . . unrelated to the decision process . . . [and] particularly [because it was] made temporally remote from the date of decision [regarding termination]." Fuentes, 32 F.3d at 767 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)) (internal quotations omitted).

Overall, the evidence offered by Plaintiff to show pretext "'lack[s] probative force in light of the undisputed evidence of record relating to [Defendant's] stated basis for the termination.'" Connolly v. Pepsi Bottling Group, LLC, 347 F. App'x 757, 760 (3d Cir. 2009) (quoting Connolly

v. Pepsi Bottling Group, LLC, No. 06-1462, 2008 WL 4412090, at *15 (W.D. Pa. Sept. 22, 2008).  The Court will "not sit as a super-personnel department that reexamines [Defendant's] business decisions," such as decisions about work assignments or whether to grant paid-time-off requests.  Snik v. Verizon Wireless, 160 F. App'x 191, 195 (3d Cir. 2005) (citation omitted). The undisputed evidence demonstrates that Plaintiff's work performance from 2006 to 2008 was negatively reviewed by three different supervisors, and that Defendant's termination of Plaintiff was a direct result of her continued performance and behavioral deficiencies, not discriminatory animus.  (See, e.g., Doc. No. 17-1 ¶¶ 35, 53, 65-69, 75, 79, 95, 98; Doc. No. 20-3 ¶¶ 35, 53, 65-69, 75, 79, 95, 98.)  Receiving negative performance reviews and subsequently being terminated does not constitute evidence of discriminatory animus.  The Court is unpersuaded that Plaintiff's proffered evidence demonstrates that the asserted non-discriminatory reason for her termination was pretextual.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment with respect to Plaintiff's discrimination claims in Counts I, III, and IV.

### B.    Plaintiff's Retaliation Claim

Although Plaintiff does not include an explicit retaliation claim in her Complaint, she still alleges that she was unlawfully terminated in retaliation for filing the discrimination claim. (Doc. No. 1 ¶¶ 8, 16, 19, 22, 25, 26.)  For reasons that follow, the Court will grant Defendant's Motion for Summary Judgment on the retaliation claim.

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that:  (1) she engaged in a protected activity known to her employer; (2) Defendant took adverse action following or simultaneous with that protected activity; and (3) a causal link exists between the

protected activity and the adverse action.  Weston v. Cmwlth. of Pennsylvania, 251 F.3d 420,

430 (3d Cir. 2001).  Here, Plaintiff's argument fails because she cannot establish the third prong,

*i.e.*, that a causal link existed between her filing a discrimination complaint and her termination.

Plaintiff argues that the temporal proximity between her informing Altamirano of her

intent to file a discrimination complaint and her subsequent termination should suffice to

establish causation.  (Doc. No. 20-2 at 8-9.)[10]  The Third Circuit has held that, "[e]ven if timing

alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged

retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be

inferred."  Krouse v. American Sterlizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).  Situations "'unusually

suggestive' of retaliatory motive[,]" and therefore establishing causation based on temporal

proximity alone, include an employer firing an employee two days after receiving actual notice of

the employee's having filed a discrimination complaint.  See Robinson, 120 F.3d at 1303

(discussing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)).

Here, Plaintiff filed her amended discrimination complaint with the PHRC and EEOC on

March 12, 2008.  (Doc. No. 1 ¶ 24.)  Defendant terminated Plaintiff on March 18, 2008, and

Defendant was served with notice of the discrimination complaint on March 26, 2008.  (Id. ¶¶

---

[10]  Although Plaintiff alleges that she informed Altamirano of her intent to file a
discrimination complaint, Altamirano testified in his deposition that he has no recollection of this
notification, nor did he have any knowledge of Plaintiff's discrimination charges and/or
complaints against him personally.  (Doc. No. 17-2 at 17 n.6.)  At the summary judgment stage,
the Court will view all evidence in the light most favorable to the non-moving party.  Therefore,
for purposes of this Opinion, the Court assumes Plaintiff did inform Altamirano of her intent to
file a discrimination complaint.

24-25; Doc. No. 17-1 ¶¶ 142-45; Doc. No. 20-3 ¶¶ 142-45.)  Plaintiff alleges that she informed

Altamirano of her intent to file a complaint in or around February 2008.  (Doc. No. 20-2 at 8.)

The gap of about one month between Plaintiff's allegedly informing Altamirano of her intent to

file a complaint and her termination does demonstrate some temporal proximity.  See, e.g.,

Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) (holding that a three month gap between

an employee's engaging in a protected activity and a subsequent adverse employment action was

sufficient temporal proximity to provide an evidentiary basis for causation).

       However, despite this temporal proximity, Plaintiff's causation argument fails because

Plaintiff received similar treatment from her supervisors both before and after she engaged in a

protected activity, i.e., before she filed (and before she informed Altamirano of her intent to file)

her discrimination complaint.  Plaintiff received negative performance evaluations as early as

June 2006.  (Doc. No. 17-1 ¶¶ 39-40 (citing Doc. No. 17 Ex. 8); Doc. No. 20-3 ¶¶ 39-40.)  She

continued to receive consistently negative reviews of her work performance up until her

probation and termination in March 2008.  (See, e.g., Doc. No. 17-1 ¶¶ 35, 53, 65-69, 75, 79, 95,

98; Doc. No. 20-3 ¶¶ 35, 53, 65-69, 75, 79, 95, 98.)  The Third and Ninth Circuits have declined

to infer retaliatory motive, even when temporal proximity exists, where an employee receives

similar treatment both before and after engaging in a protected activity.  Shaner v. Synthes

(USA), 204 F.3d 494, 504-05 (3d Cir. 2000).  See also Helfrich v. Lehigh Valley Hosp., No. 03-

05793, 2005 WL 670299, at *19 (E.D. Pa. Mar. 18, 2005) (holding that temporal proximity was

not "'unusually suggestive' . . . when an employer expresses concern about an employee's

performance deficiencies prior to the time the employee engages in allegedly protected activity")

(emphasis in original); Zsensyuk v. City of Carson, 99 F. App'x 794, 796 (9th Cir. 2004)

(holding that the plaintiff-employee's argument that causation was satisfied by temporal proximity alone was "undermined - if not nullified by" evidence that the defendant-employer treated the employee similarly both before and after their having engaged in a protected activity).

Moreover, even if Plaintiff could establish causation through temporal proximity alone, she could not satisfy her burden under McDonnell Douglas to rebut Defendant's non-retaliatory reason for her termination, namely, that she was terminated for unsatisfactory work performance and insubordination.  See Atkinson v. North Jersey Developmental, 453 F. App'x 262, 265-66 (3d Cir. 2011) (applying the McDonnell Douglas burden-shifting framework to the plaintiff-employee's claims of both discrimination and retaliation).  Mere temporal proximity, absent any evidence of retaliatory intent, is insufficient to demonstrate pretext.  Carlson v. Township of Lower Alloways Creek, 452 F. App'x 95, 101-02 (3d Cir. 2011).

Accordingly, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim.

## V.    CONCLUSION

For reasons above, the Court will grant summary judgment in favor of Defendant on Counts I - IV of Plaintiff's Complaint.  The Court will also grant summary judgment in favor of Defendant on the retaliation claim.

An appropriate Order follows.